B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>Bal Harbour, LLC | DEFENDANTS<br><br>Sioux, LLC |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br><br>James M. Nugent, Esq., Harlow, Adams & Friedman, PC<br>One New Haven Ave., Suite 100, Milford, CT 06460 | **ATTORNEYS** (If Known)<br><br>Jonathan J. Klein, Esq.<br>1445 Capital Ave., Bridgeport, CT 06604 |
| **PARTY** (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor     ☐ Other   Bal Harbour, LLC<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor     ☐ Other       Sioux, LLC<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

1. Claim to equitably subordinate a creditor's claim.
2. Claim to recover preferential transfers to a creditor.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☒ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
    actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
    (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☒ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court
    if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $  216,000.00 |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Harborside Associates, LLC | BANKRUPTCY CASE NO.<br>17-50749 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Connecticut | DIVISION OFFICE<br>Bridgeport | NAME OF JUDGE<br>Judge Manning |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>Nov. 15 2017 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>James M. Nugent | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| Harborside Associates, LLC | : | Case No. 17-50749 |
| Debtor | : | |
| | : | |
| Bal Harbour, LLC | : | Adv. Proc. No. |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| Sioux, LLC | : | |
| Defendant | : | November 15, 2017 |

### COMPLAINT

Bal Harbour, LLC ("Harbour" or "Plaintiff") files this adversary proceeding against Sioux, LLC ("Sioux") seeking a judgment from the court that the debt claimed by Sioux, LLC is equitably subordinated to the claim of Bal Harbour LLC and judgment setting aside transfers of funds by the Debtor to Sioux within the one year prior to the Order for relief as preferential.

### JURISDICTION AND VENUE

1.     The Debtor filed for relief under Chapter 11 of Title 11 on June 28, 2017 and an Order for relief entered on that same date.

2.     This case is an adversary proceeding filed pursuant to Bankr. Rule 7001.

3.     This Court has original jurisdiction under 28 U.S.C. § 1334(b) as this is a proceeding relating to the underlying case under Title 11 of the U.S. Code.

4.     This proceeding constitutes a core proceeding under 28 U.S.C. § 157(b).

5.     Jurisdiction is proper in the U.S. District Court for the District of Conn.

1

6.     Venue for this case is proper pursuant to 28 U.S.C. § 1408 and § 1409(a).

**THE DEBTOR'S PRIOR CASE AND CONFIRMED PLAN**

7.     The Debtor is a Connecticut limited liability company with its principal place of business in Connecticut.  It owns property at 946 Ferry Blvd., Stratford, CT (the "Property").

8.     Previously, the Debtor filed a prior Chapter 11 case, Case No. 11-50738 in the District of Connecticut with at least several of the same ultimate equity owners (the "Prior Case").  A Plan was confirmed in the Prior case in October, 2013.

9.     The Debtor's Third Amended Disclosure Statement in the Prior case, annexed as **Ex. A** hereto, reveals the following relevant information:

a)     at pg. 3 - the ownership structure of the Debtor.

b)     at pg. 6 - that Webster Bank originally held the first mortgage and received monthly adequate protection of $7,500.00 totaling $202,500.00 paid as of Sept. 2013. (Payments continued through confirmation on October 30, 2013; increased to $9,000.00 per month and then later increased to $18,000.00 per month.)

c)     at pg. 9, that the Holder of the first mortgage loan filed a claim for $1,880,000.00 with interest accruing at 4.125% plus prepetition taxes of $100,000.00, in addition to the second mortgage claim of $900,000.00

10.     In the Prior Case, the Debtor's Fifth Amended Plan, confirmed by the Court in October, 2013,  Ex. B hereto, treated and provided for payment of its first mortgage claim owed to Dakota HRG, LLC as follows (in pertinent part):

a) "Class 2 Secured Claim of Dakota shall be paid $9,000.00 monthly commencing on . . . the Effective Date…with interest …at the note rate of 4.125%",  with a balloon payment of the balance due in 30 months. (p. 3).

b) "The creditor shall retain the lien securing its Class 2 claim until the balance is paid in full in accordance herewith." (p. 3).

c) "the Reorganized Debtor's equity holders will contribute the sum equivalent to  any shortfall as and when required for performance of the Reorganized Debtor's obligations hereunder," (p.8) ;  the "equity holders" are presumed to mean at least Lorenzo Coletta, Luciano Coletta, and Gabriel Villano as three ultimate equity holders that promised to make the contributions.

d) The confirmed Plan does not provide for other provisions, terms, requirements or specifications for the treatment of the first mortgage claim and in particular, the confirmed Plan does not provide for the imposition of a default interest rate under any circumstances.  Furthermore, the Plan does not incorporate the original loan documents or rental assignment on behalf of Dakota HRG and there is no reference in the Plan to an assignment of rents made by the Debtor to any lender.

## SIOUX, LLC IS FORMED AND ACQUIRES THE DAKOTA CLASS 2 SECURED CLAIM

11.    After the Debtor filed the current Chapter 11 case (thus a Chapter 22); it schedules listed a secured claim owed to Sioux of $2,100,000.00.

a) Sioux first filed a claim for $1,827,716.35 and then amended it to $1,887,235.53.  Apparently Sioux is the assignee of Dakota HRG.

3

12.     During discovery, it was later learned for the first time that Sioux is owned by 3 Trusts: the Dakota Trust (Settlor-Luciano Coletta); the Lakota Trust (Settlor – Lorenzo Coletta; and the Nakota Trust (Settlor - Gabriel Villano - now deceased).

13.     Messrs. Coletta and Villano also claim to be the indirect owners of the Debtor through another LLC's they own, Hermanos, LLC.

14.     Sioux apparently obtained an assignment of Dakota's interest on or about December, 2015.

15.     In January, 2015, the Debtor's semi-annual real estate tax payment to the Town of Stratford was due in the principal amount of $33,178.64 plus interest.

16.     Sioux alleges in its amended proof of claim filed on September 19, 2017 that the first mortgage note went into default as of February 1, 2015 because the Debtor failed to pay the January, 2015 tax installment and therefore Sioux elected to accelerate the full amount of the note as immediately due and payable absent notice to the Debtor. "The default as of February 1, 2015 triggered the default rate of interest". [See Amended POC, Ex. C, in pertinent part].

17.     Sioux's proofs of claim ("POCs") further allege that, based on the default, it made demand under a rental assignment, allegedly assigned by Dakota to Sioux, on the tenant named Riverview Bistro, LLC ("Riverview") and began direct collection of all rents paid by the Debtor's tenant at the Property.

18.     Riverview pays $18,000.00 per month in rent and has paid it continuously to either the Debtor or Sioux.

19.     Sioux then collected the rental payments which were being made on a bi-weekly schedule (for reasons unknown) in installments of $8,307.69.

20.     Sioux applied a portion of these rental payments to the debt, to attorney's fees apparently owed by Harborside and to expenses incurred by Harborside.

21.     Sioux's POC and amended POC both list the value of the Property as $2,525,000.00.  However, even though its loan was being paid every month, Sioux demanded all monthly rent payments but then only paid one installment of real estate tax in January, 2015.  As a result, the Town has filed a claim for $273,629.87 which includes statutory interest at 18%.

## THE CALCULATION OF THE CLAIM ON THE FIRST MORTGAGE DEBT

22.     According to the Debtor's Prior case and the Plan and Disclosure Statement in the Prior case, the first mortgage debt was treated in the following amounts:

a)     $1,880,505.30 (amount treated in confirmed Plan);

b)     $172,500.00 (paid by Debtor as of May, 2012);

c)     $45,000.00 (paid by Debtor as of October, 2013);

d)     $217,500.00 was therefore paid on that debt as of the confirmation date of October 30, 2013; and

e)     $9,000.00 per month was then paid on that debt starting in November, 2013, as per the confirmed Plan.

23.     The first POC filed by Sioux states that at the point in time that Sioux began twice-monthly payments of $8,307.69, ". . . $9,000 per month is applied to the Note . . . (see Ex. F) and the remainder is due Harborside Associates, LLC." [See Claim #2, 8/31/17, pg. 6 of 6].

24.     Sioux's amended POC does not refer to paying money back to Harborside Associates (Debtor).

25.    A "Loan Summary" prepared by Sioux's accountant and attached to the amended POC as Ex. C, pg. 12 of 13, does purport to show how the monthly application of $15,344.51 of loan payments would reduce the first mortgage debt.  However, the starting point for the calculation of the debt allegedly owed to Sioux includes an alleged tax payment made by Dakota to the assignee of the Town's tax lien ( called Emerald ) for $115,516.70 for which Sioux apparently now asserts it is entitled to be paid by the Debtor absent any known authority.

26.    The amended POC also contains a ledger sheet prepared by Sioux's accountant which purports to explain how the "Excess rent collected from HA (Harborside)" was applied (pg. 13 of 15).  The calculation produces the final figure of $15,344.51 per month in payments after deducting payments for Harborside's legal fees, appraisals and permits.

27.    The confirmed Plan does not provide that the failure to pay taxes constitutes or triggers a default on the Class 2 claim owed to Dakota, nor for a right of acceleration nor for a default interest rate.

### FIRST COUNT - EQUITABLE SUBORDINATION

28.    The Plaintiff incorporates by reference all allegations in paragraphs 1-27.

29.    If and to the extent that Defendant Sioux asserts a secured claim against the Debtor's bankruptcy estate, said claim should be equitably subordinated to Bal Harbour's claim in its entirety.

30.    Defendant Sioux has engaged in inequitable conduct that has caused injury to the Debtor, to the Plaintiff and said conduct has conferred an unfair and improper advantage to Sioux, which conduct includes but is not limited to the following:

a)      that the ultimate owners of two-thirds of the equity (Messrs. Colleta and Villano) in the Debtor formed Sioux in December, 2014 for the sole purpose of acquiring the first mortgage loan on the Property and are the sole owners of Sioux The formation of Sioux by Messrs. Coletta and Villano and the acquisition of the Dakota Class 2 secured claim via Sioux, as a third-party entity with an undisclosed  ownership, and deliberately causing Debtor to default in the payments owed to the Town of Stratford, Plaintiff, and the unsecured creditors under the confirmed plan,  was in contravention of the obligations owed by Messer's Coletta and Villano under the plan and Sioux was used at the vehicle to accomplish this illegal purpose;

b)      that Sioux failed to inform other creditors that it is owned by insiders of the Debtor and/or that it is an affiliate of the Debtor;

c)      that the common owners of the Debtor and Sioux deceptively manipulated the application of monthly rental payments of $18,000.00 in order to declare a purported default on the first mortgage loan despite the fact that ample funds existed to pay the loan installment of $9,000.00 per month, monthly taxes of $5,529.70, and the monthly installment owed to the Plaintiff of $2,500.00 (Total = $17,029.70);

d)      that Sioux falsely manipulated the application of the rental payments in order to declare a default for the improper purpose of them imposing an alleged "default interest rate" of an extra 4% on the first mortgage loan which it then collected from the monthly rental income;

e)      that Sioux claims to have the right to collect default interest based on a provision in the first mortgage loan documents despite the fact that the treatment of the Class 2 secured claim of Dakota, HRG in the confirmed plan in the Prior case, to which Sioux claims to have succeeded, does not incorporate any of the loan documents, does not mention the loan documents, does not provide for any right to charge an interest rate other than the rate of four and one-eighth per cent and does not provide for a default and right of acceleration based on the failure to pay taxes.

f)      that Sioux used the false declaration of a default to demand that Riverview, the tenant, pay all rent to it directly thereby which it had no right to do, insuring that it totally controlled all available funds and thus depriving the Plaintiff and all other creditors of any possible payments;

g)      that Sioux then improperly utilized a portion of the rental income to pay it's legal fees and Harborside's legal fees, appraisal expenses and permits ;

h)      that Sioux in fact had no legal right to even enforce the original assignment of rents because it was not incorporated into the provisions of the confirmed Plan, was not preserved for Dakota HRG in the confirmed Plan and therefore did not survive the plan confirmation and could not have been assigned to Sioux.

i)      that by virtue of the undisclosed insider relationship of Sioux and Harborside, the improper and illegal purported exercise of rights under a nonexistent assignment of rents, the deceptive manipulation of the rental payments to falsely declare a default on the first mortgage loan and the demand

8

for the receipt of all rental payments, Sioux improperly inflated the interest rate in order to enrich itself to the great detriment of the Plaintiff; and

j)      As a result of all the foregoing the real property taxes increased from $112,204.00 in the prior case to $273,629.87 in this case.

31.     Sioux is an insider of the Debtor, either statutory or non-statutory.

32.     Sioux obtained an unfair advantage over the Plaintiff and all other creditors and caused injury to them all as a result of its conduct as described above.

33.     Pursuant to Bankr. Code §§ 510(c) and 105(a), the claims filed by Sioux should therefore be subordinated to the claim of Bal Harbour LLC as such is consistent with the intent and provisions of the Bankr. Code which provides authority for the subordination of a creditor's claim to that of other creditors in appropriate circumstances.

## SECOND COUNT

34.     The Plaintiff incorporates herein by reference Paragraph's 1-33 above.

35.     In the 90 days preceding the filing of the Debtor's current petition, Sioux was paid at least $46,033.53 and possibly up to $54,000.00.

36.     These payments constitute transfers of property of the Debtor to or for the benefit of Defendant Sioux, a creditor of the Debtor.

37.     The payments were made for or an account of an antecedent debt allegedly owed by the Debtor to Sioux prior to these transfers.

38.     These transfers enabled Sioux to receive more than it would have received if the case was one under Chapter 7, the transfer had not been made and Sioux received payment of such debt, as subordinated; in that instance Sioux should not have received any payments.

39.     These payments constitute avoidable preferences pursuant to Code Sec. 547 that are recoverable pursuant to Code § 550.

40.     Further, as Sioux has failed to return any preference payments the Court should disallow its claim as well pursuant to Code § 502(d).

## THIRD COUNT

41.     The Plaintiff incorporates herein by referenced Paragraph's 1-40 above. In the 365 days preceding the filing of the Debtor's current petition, Sioux was paid at least $199,384.56 and possibly up to $216,000.00.

42.     These payments constitute transfers of property of the Debtor to or for the benefit of Defendant Sioux, a creditor of the Debtor and an insider of the Debtor.

43.     The payments were made for or an account of an antecedent debt allegedly owed by the Debtor to Sioux prior to these transfers.

44.     These transfers enabled Sioux to receive more than it would have received if the case was one under Chapter 7, the transfer had not been made and Sioux received payment of such debt, as subordinated; in that instance Sioux should not have received any payments.

45.     These payments constitute avoidable preferences pursuant to Code Sec. 547 that are recoverable pursuant to Code § 550.

46.     Further, as Sioux has failed to return any preference payments the Court should disallow its claim as well pursuant to Code § 502(d).

WHEREFORE, the Plaintiff claims:

1.    Judgment subordinating the claim of Sioux LLC to the claim of Bal Harbour LLC.

2.    A declaration that the claims of Sioux, LLC are disallowed.

3.    Judgment that the payments made to the Sioux in the 90 days prior to this bankruptcy case, are avoidable preferences, and enter judgment against Sioux and in favor of the Plaintiff for the benefit of the Debtor's Estate for all such payment.

4.    Judgment that the payments made to Sioux, LLC in the 365 days prior to this bankruptcy case are avoidable preferences, and enter judgment against Sioux, LLC and in favor of the Plaintiff for the benefit of the Debtor's Estate, for all such payments.

5.    Judgment disallowing any claim of Sioux LLC pursuant to Code Sec 502(d).

6.    Prejudgment interest at the statutory rate.

7.    Attorney's fees and expenses.

8.    Such other relief as the Court deems just and equitable.

PLAINTIFF,
BAL HARBOUR, LLC

BY: _____
        James M. Nugent  ct# 08822
        Harlow, Adams & Friedman, P.C.
        One New Haven Avenue, Suite 100
        Milford, CT 06460
        Tele No. (203)878-0661
        Fax No. (203)878-9568
        Jmn@quidproquo.com

# EXHIBIT A

B25B (Official form 25B)(12/08)

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF CONNECTICUT

In Re:  Harborside Associates, LLC        Case No.  11-50738 AHWS
       Debtor

                                 Chapter 11

---

## HARBORSIDE ASSOCIATES, LLC
## THIRD AMENDED DISCLOSURE STATEMENT
## DATED JULY 25, 2013

## I.    INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") in the Chapter 11 case of Harborside Associates, LLC (the "Debtor" or "Harborside" or "Proponent"). This Disclosure Statement contains information about the Debtor and describes the Harborside Associates, LLC Third Amended Plan of Reorganization (the "Plan") filed by the Debtor on July 25, 2013. A full copy of the Plan as amended is attached to this Disclosure Statement as Exhibit A. *Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney you may wish to consult one.*

The proposed distributions under the Plan are discussed at pages 12 to 15 of this Disclosure Statement. General unsecured creditors with claims over $1,000 are classified in Class 5, and will receive a distribution of about ten percent (10%) of their allowed claims, to be distributed in monthly payments over five (5) years. Smaller unsecured claims and the classes of secured claims are classified separately as described below.

### A.    Purpose of this Document

This Disclosure Statement describes:

- The history of the Debtor and significant events during the bankruptcy case,
- How the Plan proposes to treat claims or equity interests of the type you hold (i.e., what you will receive on your claim or equity interest if the plan is confirmed),
- Who can vote on or object to the Plan,
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan,
- Why Harborside believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and
- The effect of confirmation of the Plan

Be sure to read the plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself, if confirmed, that will establish your rights.

B.    **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1. *Time and Place of the Hearing to Confirm the Plan*

The hearing at which the Court will determine whether to confirm the Plan will take place on September 10, 2013, at 10:00 a.m. o'clock, in at the United States Bankruptcy Court for the District of Connecticut, Bridgeport Division, 915 Lafayette Boulevard, Bridgeport, CT 06604.

2. *Deadline for Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot to counsel to Debtor: Carl T. Gulliver, Coan, Lewendon, Gulliver & Miltenberger, LLC, 495 Orange Street, New Haven, CT 06511. See Section IV.A. below for a discussion of voting eligibility requirements.

Your ballot must be received by September 6, 2013, or it will not be counted.

3. *Deadline for Objecting to the Confirmation of the Plan*

Objections to the confirmation of the Plan must be filed with the Court and served upon counsel to Debtor, Carl T. Gulliver Coan, Lewendon, Gulliver & Miltenberger, LLC, 495 Orange Street, New Haven, CT 06511 by September 6, 2013.

4. *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact counsel to Debtor, Carl T. Gulliver at the above address or via telephone at (203) 624-4756 or email at cgulliver@coanlewendon.com.

C.    **Disclaimer**

*The Court has approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has conditionally approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.*

II.    **BACKGROUND**

A.    **Description and History of the Debtor's Business**

Harborside Associates, LLC, was formed as a Connecticut limited liability company on March 8, 2001, for the purpose of buying and developing a 3.3 acre parcel of real estate at 946 Ferry Boulevard in Stratford, Connecticut (the "Property"). The Property, along the west bank of the Housatonic River, was purchased in April 2001, for $1,000,000.

2

In 2003 Harborside built a free-standing restaurant building of about 9,406 square feet on the Property with an additional 1,994 square feet of outdoor service. Harborside installed a paved parking lot around the restaurant building and also fitted out the restaurant with equipment and furnishings. A separate entity, formed in 2003 as Harborside Bar & Grille, LLC, rented and operated the restaurant for several years.

Harborside, however, was looking to develop the Property further. In June of 2007, Harborside, at significant capital expense, received site plan approvals for a mixed use development (together, the "Approvals"). (For these and other investments Continuity LLC, the entity that owns Harborside, and the individual members of Hermanos, LLC, one of the entities that owns Continuity, LLC, have over the years placed substantial mortgages on the Property.) Approvals included the construction of 42 residential condominium units, retail stores, and a 36-slip marina. For required parking the development would include two separate parcels adjacent to Harborside's Property. One is a property known as 876 Housatonic Avenue Extension, which was purchased in November 2006 by one of the individual owners of Hermanos, LLC, Mr. Gabriele Villano. The other is a sliver of land that is owned by an entity called Shorty Long Irons I, LLC, which on information and belief is owned by the wife of another such individual equity owner of Hermanos, LLC, Mr. Anthony Villano.

In 2007 and through the present time Harborside Associates, LLC, has been owned 100% by another Connecticut limited liability company, Continuity, LLC. Anthony Villano and Gabriele Villano, who are brothers, along with Luciano Coletta and Lorenzo Coletta, also brothers, are the four equal members of Hermanos, LLC, which owns two-thirds of Continuity, LLC. The other one-third of Continuity is owned by an entity known as The Covenant, LLC. The Covenant, also a Connecticut limited liability company, is owned by, or at least controlled by, the Anastasio Family Trust acting through Mr. Andrew Anastasio, Jr., a trustee. (Hereinafter the aforementioned LLCs will be referred to respectively as "Continuity", "Hermanos", and "Covenant"). Harborside's ownership is diagrammed in Figure 1, below.

*Figure 1*
*Pre-Petition Ownership of Harborside Associates, LLC*



Harborside was unable to put together the funds necessary to proceed with the further development of the Property. As a consequence it entered discussions on a joint venture with The Salce Companies, LLC (hereinafter, "Salce") who Harborside believed could obtain the necessary financing

and provide additional development expertise. In November 2007 Harborside and Salce formed together an entity called Harbor Vue, LLC, to use in the project. Salce invested $500,000 in the project which enabled Harborside Associates, LLC, to buy the interest of a former partner in Harborside or Continuity. In addition, Salce claims to have invested substantial additional sums.

Many issues and disputes arose between Harborside and Salce. All these disputes were the subject of claims, defenses, and counter-claims in the state court case of *The Salce Companies, LLC v. Harborside Associates, LLC*, that was pending, among others, at the time of commencement of this Chapter 11 case. While such cases against the Debtor were stayed by operation of §362 of the Bankruptcy Code, the Debtor has not taken steps to date to proceed with its counter-claims and instead has engaged in conversation with Salce during these proceedings relating to possible future development agreements and resolution of the claims between them. While Harborside believes its legal positions are strong, regardless of the disputes Harborside believes that the project was doomed by the unprecedented economic downturn that quickly followed the Approvals. In any event no further development has proceeded to the date of this Statement.

By the end of 2009 Anthony Villano had formed a Connecticut limited liability company known as Savin Rock Roasting Company II, Inc. While other individual members of Hermanos and The Covenant believed the entity was formed for all of them to be members, in fact no such documentation was executed. Savin Rock Roasting Company II, Inc. ("SRRC-II") took over operations of the restaurant on Harborside's Property. While originally Anthony Villano's operational control of the restaurant was consensual, over time the other individual members of the underlying entities became increasingly concerned about his taking individual control of all finances of SRRC-II, and, by way of a unified banking account, all funds of unrelated businesses owned and operated by different combinations of the individual members of Hermanos and The Covenant.

Ultimately, Anthony Villano caused SRRC-II to default on its lease with Harborside and caused Harborside to default on its first mortgage payments, and its real property tax payments. Previously these payments generally had been made in a timely way.

The full scope and the severity of the situation were concealed from the other parties by Anthony Villano. The other individuals involved in Hermanos and The Covenant suspected significant self-dealing and diversion of funds by Anthony Villano. Finally around August 2010, Webster Bank N.A., then holder of the first mortgage on Debtor's Property, commenced its foreclosure in Superior Court, Judicial District of Fairfield at Bridgeport. In that case on January 10, 2011, the Superior Court (Hartmere, J.) found the fair market value of the Property to be $1,700,000. (This valuation was based on an appraisal obtained by Webster Bank during the foreclosure case which determined the market value as of October 15, 2010. The appraisal is described further at Section 1.F. below.) The Court set a law day that required the emergency filing of the Petition herein on April 12, 2011, so as to avoid loss of title to the Debtor's Property.

Meanwhile Harborside, through efforts of the Colettas and Gabriele Villano, supported as well by Andrew Anastasio, sought to wrest control of the Property from Anthony Villano. Harborside issued a Notice to Quit to Savin Rock Roasting Company II, Inc. on February 23, 2011, and was proceeding to seek eviction of SRRC-II and Anthony Villano from the Property. The defendant answered and sought to defend in Housing Court. Then on March 10, 2011, SRRC-II filed a Chapter 11 petition in this Court designated case number 11-50438 ahws, which operated to stay the housing court matter.

4

In SRRC-II's Chapter 11 case, Harborside filed a motion for relief from the automatic stay of §362(a) of the Bankruptcy Code on March 22, 2011, seeking the Bankruptcy Court's authorization to proceed with the eviction. After a disputed hearing, an order granting said relief was entered in favor of Harborside on April 12, 2011, the same day Harborside was compelled by the law day in the foreclosure by Webster to commence its own petition under Chapter 11.

### B.   Insiders of the Debtor and Management Before and During the Case

As set forth in Figure 1, page 3 above, the Debtor's ownership has always been in layers. A limited liability company known as Continuity owns all of the Debtor's membership interests, and on information and belief, nothing else. Continuity is owned two-thirds by Hermanos, LLC, which therefore holds the voting control over the Debtor's affairs. Hermanos is owned in equal shares by four individuals who are two sets of brothers: Luciano and Lorenzo Coletta and Anthony and Gabriele Villano. Anthony Villano is the same individual who took control of Debtor's Property and funds, as well as other assets of the other members, prior to the Petition for about two years. Therefore, although of course they were and are insiders, the Colettas and Gabriele Villano essentially had no practical management authority over the Debtor's affairs from about 2009 through the Petition Date, and then gained actual control only after evicting Anthony Villano and SRRC-II by legal force as will be described below.

In addition to the foregoing insider individuals the one-third owner of Continuity, known as The Covenant, LLC, is, on information and belief, controlled by F. Andrew Anastasio, Jr. and the Anastasio Family Trust, who would also be construed insiders.

Luciano Coletta was designated by the owners of Continuity to be the manager of the Debtor for Chapter 11 purposes. He has consulted as appropriate throughout these proceedings with the other above referenced insiders, excluding Anthony Villano.

### C.   Significant Events during the Bankruptcy Case

The original voluntary petition under Chapter 11 was filed herein by Debtor on the twelfth day of April 2011, automatically and immediately stopping the operation of the law day in the Webster Bank foreclosure that otherwise would have caused the loss of title to the Property. Debtor promptly filed necessary motions to retain Coan, Lewendon, Gulliver & Miltenberger, LLC, of New Haven, Connecticut, as Chapter 11 counsel and shortly after to retain Attorney David C. Pite to continue Debtor's housing court battle with Anthony Villano and SRRC-II. SRRC-II continued to do battle with Harborside in the Bankruptcy Court in creditor meetings both in the still pending SRRC-II case and the newly filed Harborside case. Extraordinary time of Debtor's management and professionals was required to deal with Anthony Villano and his counsel.

While dealing with both SRRC-II and all necessary compliance with Chapter 11 procedural and organizational details including filing of schedules and statements and attending to demands of the Office of the United States Trustee and repeated creditor meetings with SRRC-II in both cases, Debtor's counsel was simultaneously engaged in contested and prolonged housing court hearings in State Court in Bridgeport where Attorney Pite took the lead and Debtor's Chapter 11 counsel, members of the owning entities, and other prior professionals of Debtor were required as witnesses. Ultimately the Housing Court issued a decision entirely in favor of Harborside. Even yet the litigation continued as SRRC-II appealed to the State Appellate level. Harborside had to file a motion with the appellate court to terminate the stay of the eviction. After a pre-argument conference before an Appellate Court Justice

5

that again required the appearance of Debtor's special counsel and general Chapter 11 counsel Harborside was compelled to file and prosecute a motion to dismiss the appeal. With SRRC-II having failed to post the necessary bond or to pay required use and occupancy, the Court granted Harborside's motion to dismiss the appeal and the judgment became final. Thus after inordinate delay and expense Harborside was able to effect the ejectment of SRRC-II and Anthony Villano from the Property.

Webster Bank, originally holder of the first mortgage on the Property, filed a motion seeking relief from the automatic stay of its foreclosure case about two weeks after the Petition Date. Debtor successfully opposed the motion, then later agreed in the context of cash collateral discussions, to commence adequate protection payments of $7,500 monthly. Said payments have continued from about July 2011 and shall continue through Confirmation. (The claim is now held by, and payments are made to, Dakota HRG, LLC.) Thus if Confirmation were to occur in September, said claimant may receive about twenty-seven (27) payments, or $202,500 during the Chapter 11 case.

Similarly, The Salce Companies, LLC filed a motion for relief from stay on November 3, 2011. The appraisal upon which Salce based its relief from stay motion projected costs and profits of the full site plan development after consolidation of the Property with the Shorty Long Irons I parcel and the 876 Housatonic Avenue Extension parcel, neither of which are presently titled in Debtor's name.

While Debtor was preparing to defend against the Salce motion at a significant cost including likely disputed and contradictory appraisal testimony, discussions between the parties lead to an agreement for adequate protection payments. Pursuant to a stipulation and continuing agreed cash collateral orders thereafter, four (4) payments were made to Salce in the sum of $3,500 and then, again assuming a projected confirmation date of September 2013, it is expected fifteen (15) additional payments will have been made of $4,400 each. Thus through Confirmation Salce will have received $80,000 during the Chapter 11.

In February and March 2013 Salce and the Debtor each filed separate proposed Chapter 11 plans. Salce also filed a motion to value the Property, and an objection to a claim represented by a mortgage recorded against the Property in March 2010, in the sum of $1.4 Million, in favor of Anthony Villano, Gabriele Villano, Luciano Coletta, and Lorenzo Coletta. In light of agreements between Salce and the Debtor reached after lengthy negotiation, Salce has or will be withdrawing its plan. While the motion to value the Property will proceed, the Colettas and Villanos determined not to oppose the objection and have allowed an order requested by Salce to enter which voids any claim they held that was secured by the March 2010 mortgage.

Also during the case the Debtor obtained a fourth continuation of the Approvals. The Debtor sought parties that might be interested in the further site development. The Debtor could not find credible parties who believed there is economic viability in the project at this time. Thus the Debtor has proceeded to focus on the restaurant lease as the basis of this reorganization plan, although it continues to consider further future development in discussions with Salce.

Throughout the Chapter 11 proceedings the Debtor has filed the required monthly operating reports and complied with other Chapter 11 obligations.

The Office of the United States Trustee filed a motion seeking, among other things, a deadline for a plan. In light of its decision respecting the best use of its Property, Debtor immediately consented to a deadline which is the date the Debtor's Plan and Disclosure Statement first were filed.

6

### D.    Projected Recovery of Avoidable Transfers

The Plan preserves claims against and arising in connection with pre-petition control of Debtor's affairs by Anthony Villano. Substantial forensic accounting may be required at significant expense. Because of the nature of any such claims Debtor does not rely on collection of preference, fraudulent conveyance, or other avoidance actions for performance of this Plan. The Debtor has commenced and preserves for the estate, an action against Anthony Villano, Ellen Villano and Shorty Long Irons I, LLC to recover the Shorty Long Irons parcel for the Debtor. The Plan similarly preserves other claims including recovery of the 876 Housatonic Avenue Extension property if later such action is deemed appropriate or necessary.

### E.    Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. More on claims disputes and the resolving disputed claims is set forth in Article V of the Plan.

### F.    Current Financial Condition of Debtor

Debtor's assets consist of the Property, restaurant equipment and furnishings, the lease of the Property, including the equipment and furnishings, development approvals and various claims. Other than the lease said assets are described in Schedules A and B, as amended, filed by Debtor in this case. Copies are appended as Exhibit B.

The value of the Property is subject to debate. The Debtor has scheduled the Property as worth $1.7 Million per the appraisal obtained by the bank in the pre-bankruptcy foreclosure case as stated in Debtor's Schedule A filed herein and included within Exhibit B to this Statement. Webster Bank had obtained the MAI-certified appraisal which was prepared by Wellspeak, Dugas & Kane of Cheshire, Connecticut as of October 15, 2010. In preparation of its plan and a possible contested dispute over the Property, Salce obtained an appraisal based on various assumptions about development potential setting the value at $2.6 Million for the Property (with additional value assigned to contiguous non-debtor property). In the same context the Debtor obtained an appraisal of the Property, without other parcels and as is, assigning the value of $1.15 Million. In each analysis the value is less than the total Class 1, Class 2, and Class 3 secured debt.

The Debtor has obtained extensions of the Approvals four times since they were first issued, no development has proceeded. The Approvals, as previously stated require consolidation with contiguous parcels, one of which also is over-encumbered.

In connection with the site development plans of 2007-2008 with Salce, Debtor and Salce formed a limited liability company called Harbor Vue, LLC. To the best of Debtor's knowledge the company never did business and owns nothing. Therefore Debtor assigns it a value of zero.

Debtor also owns most of the equipment and furniture and fixtures in the restaurant excluding certain items added by Debtor's tenant. This personal property is several years old at this time. While serviceable in place, Debtor believes it has minimal saleable value and therefore believes it does not add measurably to liquidation value. In addition the equipment is included in the lease to Debtor's tenant.

7

In the ordinary course of its business, as soon as it was successful in ejecting SRRC-II and Anthony Villano from control of the Property, Harborside commenced discussions with several parties interested in leasing the restaurant. The terms Harborside required of the prospective tenant included a substantial investment in the restaurant facility, as well as payment of current tax obligations because of the condition of the restaurant as left by SRRC-II and the six months of nonpayment of rent around the end of the occupancy of the Property by SRRC-II. Finally Harborside chose Riverview Bistro, LLC, formed by David Petrone in April 2012. Mr. Petrone has substantial experience running restaurants and has run prior restautant operations in this location.

Mr. Petrone obtained the financing and then opened the Riverview Bistro after a reasonable period of reconstruction and repairs including some significant HVAC installations. Some of this work was funded by the significant deposit in the sum of over $110,000 as required by the lease negotiated by Harborside. The lease provided that the deposit would be used for such purpose. The deposit also funded payment of about $56,000 for taxes and sewer bills outstanding to the Town of Stratford, most of which was for the post-petition periods that needed to be paid to obtain operating permits for any restaurant that would open in the Property. In addition some deposit money funded payment to the debtor of the initial months of rent that had been waived during the construction period and which funds allowed Debtor to maintain necessary insurance and adequate protection payments to the holder of the first mortgage and to The Salce Companies during this period of several months without income after the Debtor was able to eject its prior tenant.

The lease requires payments of $18,000 monthly. Riverview has requested, and Harborside has agreed, as necessary during the initial year, and particularly during the winter months, to pay in bi-weekly installments, but in the opinion of Harborside, Riverview is operating professionally and successfully. The lease term is ten years with two options to extend for five additional years each. The lease rental does not increase during the term of the lease. The lease requires the tenant to pay utilities, maintenance, personal property taxes on Debtor's restaurant equipment and furnishings, and sewer charges. The tenant also is required to maintain liability, property damage and one year's rental interruption insurance.

Considering all aspects of the lease, the Debtor, in the exercise of its sound business judgment, determined that the lease Riverview was willing to enter was superior overall to terms discussed with any other party interested in the property. While chapter 11 debtors must obtain court approval of transactions outside the ordinary course of the debtor's business, a debtor in possession is authorized to conduct its business in the ordinary course. Because Harborside believes its central business is leasing the Property for restaurant operations, it perceives the lease to be within the ordinary course of its business. Consequently Harborside has not sought or obtained Court approval of the lease.

Finally, Harborside may hold various claims. Upon confirmation of this plan Debtor and Salce shall release claims against each other, but for the Class 3 treatment proposed herein. The Debtor may hold claims against Anthony Villano, SRRC-II, and an entity also formerly controlled by Anthony Villano called Post Road Management, LLC. Harborside is uncertain as to whether any affirmative collection is likely to be realized from claims it could assert against SRRC-II and Anthony Villano and Post Road Management, LLC. Because of the disputed nature of all such claims Harborside would expect any liquidating agent to abandon them. Confirmation also reserves and transfers to the reorganized Debtor the eminent domain action pending in the Connecticut Superior Court as Commissioner of Transportation/CT vs. Harborside Associates, LLC, et al., case no. FBT-CV09-5027821-S. (In connection with latter matter Debtor believes that well prior to the Petition Date an award was determined and received and a deed recorded.)

8

In addition, Harborside has commenced an adversary proceeding for recovery of the Shorty Long Irons I sliver of land. The Plan preserves any claim of Debtor for recovery of the 876 Housatonic Avenue Extension but that property would come with substantial financial burden which Gabriele Villano, as well as the Colettas are carrying at significant personal sacrifice entirely outside of this estate. Thus this claim also is of dubious value and while preserved by the Plan, may or may not be pursued.

Thus the real property taxes and sewer use charges remaining owing from the pre-petition proofs of claims of about $100,000 plus the balance claimed by the first mortgagee in the amount of $1.88 Million plus the payoff amount of Salce's second mortgage alone which Salce estimates at in excess of $900,000, totaling about $2.9 Million together, are well in excess of any estimate of value of the Property. Debtor believes the liquidation of its Property with the very likely abandonment of restaurant equipment and all claims by a liquidating agent or trustee, will provide no recovery whatsoever for any other creditors.

Income of the Debtor, as set forth above, is $18,000 monthly. Approximate operating expenses, before any debt service or repayment of claims of any class herein comprise the following:

### Monthly for Current Costs of Operations

| | |
|---|---|
| Real Property Tax | $5,351 |
| Insurance | $750 |
| Accounting/Legal Fees | $150 |
| Capital Reserve/Repairs | $250 |
| Total | $6,501 |

Thus about $11,500 remains monthly to fund all requirements under the Plan. According to Debtor's projections the plan performance will require the full $18,000 from rentals and about $4,000 in monthly contributions from the Reorganized Debtor's owners as detailed in Exhibit C and as further described in Section III.E., below.

## III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A. What is the Purpose of the Plan of Reorganization?

As required by Title II of the United States Code, (the "Bankruptcy Code" or the "Code), the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B. Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. These types of claims as they arise in the Harborside Chapter 11 case are as follows:

### 1. *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case and other claims as defined in and allowed under § 503 of the Code. Also included at the same priority level under §507(a)(2) are quarterly fees due the Office of the United States Trustee which are based on the Debtor's total disbursements during the prior quarter. The Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

Amounts of administrative expenses set forth herein are estimated as of the date of this statement for convenience only, and are subject to approval. Actual amounts through confirmation obviously will be more. Administrative expenses in connection with confirmation, particularly if disputed, can be significant and any estimate would be speculative and possibly misleading. The following chart lists the Debtor's estimated administrative expenses as of this time, and their proposed treatment under the Plan:

| Type | Amount | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | n/a | Paid according to terms of obligation and assumed by the Reorganized Debtor. |
| Coan, Lewendon, et al Professional fees, subject to approval by the Court, over and above retainer paid | $100,000 | Court approval will be considered upon application. Allowed claims will be paid over time thereafter by agreement only if this plan is confirmed. |
| David C. Pite, Esq. Professional fees, subject to approval by the Court, over and above retainer paid | $20,000 | Court approval will be considered upon application. Allowed claims will be paid over time thereafter by agreement only if this plan is confirmed. |
| Clerk's Office fees | $0 | Paid in full on the Effective Date of the Plan. |
| Other Administrative expenses | $0 | Paid in full on the Effective Date of the Plan. |
| Office of the U.S. Trustee Fees | $650 | Any outstanding fees will be paid in full on the Effective Date of the Plan; Quarterly fees after Effective Date will be paid when due. |

### 2. *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority claim agrees otherwise, it must receive the present value of such claim including interest applicable under non-bankruptcy law, in regular installments paid over a period not exceeding five (5) years from the order of relief. Because of the amount involved, Debtor proposes a shorter time period.

Precise interest and payment amounts are subject to adjustment to applicable rates at the confirmation date as required by § 511 of the Bankruptcy Code. The following chart lists the Debtor's estimated § 507(a)(8) priority tax claims and their proposed treatment under the Plan:

| Creditor | Amount | Treatment |
|---|---|---|
| Connecticut Department of Revenue Services | $1,190 | Pmt interval: Monthly Payment: $73 |

| | | Begin date: Effective Date<br>End date: 18 Months<br>Interest rate %: 12.0<br>Total payout amount: $1,314 |
| --- | --- | --- |

## C.    Classes of Claims and Equity Interests

The following are the classes set forth in the Plan:

Class 1.     Real Property Tax and Sewer Use Claims

The Allowed Secured Claims of the Town of Stratford and any assignees thereof, for real property tax and sewer use charges including costs, charges and fees Allowable in connection therewith to the extend Allowed first priority lien status pursuant to applicable state law, whether or not a lien has been recorded.

Class 2.     Secured Claim of Dakota HRG, LLC

The claim of Dakota HRG, LLC ("Dakota") or any assignee to the extent Allowed and secured by a first priority mortgage, assignment of rents and other security documents.

Class 3.     Secured Claim of The Salce Companies, LLC

All claims of The Salce Companies, LLC, whether evidenced by a mortgage on the Property or otherwise and specifically including without the intention of limiting the class, a claim secured by a mortgage in the sum of $500,000 recorded September 12, 2007, at volume 3103, page 87, among the Stratford land records, and a line of credit claim secured by a mortgage in the original maximum amount of $500,000 recorded on March 5, 2008, at Volume 3164, Page 120 (together, the "Salce Claims").

Class 4.     Small Unsecured Claims – Convenience Class

All unsecured claims Allowed under § 502 of the Code that are in an amount less than or equal to, or by election of the claimant reduced to, $1,000.

Class 5.     General Unsecured Claims

All unsecured claims Allowed under §502 of the Code that are in an amount greater than $1,000 unless the claimant has opted to reduce its claim to $1,000. This class includes the claims, to the extent same are Allowed claims, of all claimants that hold a mortgage or other encumbrance on the Property but are not in classes 1, 2 or 3 above. Such ostensibly secured claims are included in this Class 5 on the basis that the secured positions of each such claimant will be determined by the Court to be of no value upon application of §506 of the Code.

<u>Class 6.</u>     Equity interests of the Debtor

All equity interests in the Debtor as set forth on the Debtor's books and records as of the Effective Date which consists of the 100% membership interest in the Debtor held by Continuity, LLC.

**D.  Treatment of Classes of Claims and Interests under the Plan**

Classes of Claims and interests shall be treated as follows under this Plan:

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 – Real Property Tax and Sewer Use Claims | Impaired | Class 1 Real property tax and sewer use claims will be paid in full in sixty (60) monthly installments commencing on the fifteenth (15th) day of the first full calendar month after the Effective Date of this Plan, amortized with eighteen percent (18%) interest.  The Class 1 claimants shall retain the liens securing their claims until paid in full. |
| Class 2 – Secured Claim of Dakota | Impaired | Class 2 Secured Claim of Dakota shall be paid $9,000 monthly commencing on the first day of the first full calendar month after the Effective Date of this Plan, amortized with interest on the outstanding balance at the note rate of four and one-eighth percent (4.125%). The creditor shall be paid its full outstanding balance on or before the last Business Day of the thirtieth full calendar month after the Effective Date.  By agreement with the Plan Proponent, effective only in the event this Plan or an amendment thereto is confirmed, said claim, mortgage, and any other security therefore, shall be released by the creditor if either (a) the Reorganized Debtor  pays the then full outstanding balance less $200,000 on or before the last Business Day of the twelfth full calendar month after the Effective Date, or, (b) if the Reorganized Debtor pays the then full outstanding balance less $100,000 after said date but on or before the last Business Day of the twenty-fourth (24th) full calendar month after the Effective Date.  The creditor shall retain the lien securing its Class 2 claim until the balance is paid in full in accordance herewith. |
| Class 3 – Secured Claim of The Salce Companies, LLC | Impaired | All Salce Claims together shall be allowed in the total amount of $600,000 with interest from the Effective Date at 6% per year. Said claim shall be payable as follows:<br><br>• Paid $2,500 monthly commencing on the |

first day of the first full calendar month after the Effective Date of this Plan, until paid or settled in accordance with the following provisions.

- If not sooner paid, the Note matures and shall be paid in the total amount of $600,000 plus all outstanding, accrued and unpaid interest to the date of payment on or before the last Business Day of the thirty-sixth (36th) full calendar month after the Effective Date.

- By agreement with the Plan Proponent, effective only in the event this Plan or an amendment thereto is confirmed, said claim, mortgage, and any other security therefore, shall be released by the creditor if on or before 365 days after the Effective Date the Reorganized Debtor pays $500,000 plus all outstanding accrued and unpaid interest to the date of payment.

The Reorganized Debtor shall execute a note modification essentially in the form appended hereto as Exhibit D (the "Modified Note") setting forth the foregoing and following terms. All payments owed to Salce hereunder as set forth in the Modified Note must arrive in Salce's hands at 335 Ferry Boulevard, Stratford, CT 06615, or such other location as Salce may hereafter designate in writing, in order to be considered a timely payment, and the failure to have same delivered timely shall constitute an event of default, time being of the essence for all such payments. The Modified Note shall provide for acceleration upon breach in payments after a three-day written notice to the reorganized Debtor and counsel following a ten-day grace period. The three-day written notice shall be sent to the addresses for the reorganized Debtor and counsel as specified in the Plan for such notices and shall be transmitted by first class mail and by fax or email, whichever is designated for the Debtor and its counsel in the Plan.

In addition to nonpayment of the Modified Note, events of default shall include failure to timely pay

13

| | | |
|---|---|---|
| | | pursuant to this Plan all Class 1 and Class 2 payments and to timely pay all post-confirmation municipal claims including without limitation water and sewer charges, and real property taxes, and all post-confirmation payments due Dakota or other holder of secured debt prior to Salce. It shall be a requirement of Confirmation that all such municipal claims accruing during the chapter 11 case through the date of Confirmation shall have been paid by the date of entry of the Confirmation Order. It shall also be an event of default should the reorganized Debtor fail to maintain proper and adequate insurance on the Property which shall name the holder of the Modified Note as mortgagee and shall provide proper proof of such coverage every year.<br><br>Salce shall agree to subordinate the Modified Note and mortgage securing same to new financing of the senior debt owed to Classes 1 and 2 in an amount not to exceed the allowed pre-petition claims of Class 1 and 2. The Debtor shall waive all defenses to the execution of and enforcement of the Modified Note and mortgage securing same and shall acknowledge and reaffirm the validity, execution and enforceability of the Modified Note and mortgage.<br><br>Salce shall release all pre-confirmation liens, mortgages or other encumbrances on the Property but for its senior most mortgage recorded September 12, 2007, at Volume 3103, Page 87, of the Stratford Land Records which shall serve to secure the Modified Note. Salce shall retain said lien securing its Modified Note, until the balance is paid in full or settled in accordance herewith. The Debtor and Salce shall trade mutual releases in a form acceptable to each other's counsel as to all other claims between them.    Confirmation shall be contingent on Salce having withdrawn the Salce 1111(b) election. |
| Class 4 – Small Unsecured Claims | Impaired | Class 4 Small Unsecured Claims shall be paid one-third on the Effective Date, one-third 30 days after the Effective Date, and one-third 30 days thereafter of the Allowed amount. |
| Class 5 – General Unsecured Claims | Impaired | Class 5 General Unsecured Claims shall be paid their respective Pro Rata share of $500 monthly commencing on the fifteenth (15th) day of the first full calendar month after the Effective Date, for sixty |

| | | |
|---|---|---|
| | | (60) months.   Any security therefore shall be released by the claimant. In addition any recovery, net of legal and professional fees and costs, of claims against SRRC-II and Anthony Villano and Post Road Management, LLC will be paid to Class 4 claimants until Class 4 is paid in full. |
| Class 6 -- Equity Security Holders of the Debtor | Impaired | Class 6 Equity Security Holders of the Debtor, Continuity, LLC's membership interest, shall be expunged and an entity to be formed prior to confirmation which shall be held two-thirds by an entity owned equally by Luciano Coletta, Lorenzo Coletta and Gabriele Villano, and one-third by The Covenant, LLC, shall be issued a 100% membership interest in the Debtor. |

### E.  Means of Implementing the Plan

1.     *Sources of Payments*

Payments and distributions under the Plan will be funded by cash on hand, rental receipts from future operations of the Debtor, and capital contributions from Reorganized Debtor's equity.  No later than month thirty (30) Debtor will refinance its Property to fund the final balance to Class 2, Dakota or its assignee.  Not later than month thirty-six (36) Debtor will refinance its Property to fund the balance to Class 3, Salce.  The Reorganized Debtor's projected income and expenses are summarized in Exhibit C attached hereto.

2.     *Releases of Liens*

Debtor must require the release of all encumbrances of record on Debtor's Property but for the Town's, or its assignee's, liens and statutory encumbrances, and the liens of Dakota or its assignee and Salce.  All other liens shall be released or voided by court order on the Valuation Motion.

3.     *Post-confirmation Management*

The Post-Confirmation Managers of the Reorganized Debtor, shall be Luciano Coletta or any successor duly appointed by the Reorganized Debtor's equity.  Such manager will receive no compensation for services rendered to Harborside during the performance of this Plan.

### F.  Risk Factors

The proposed Plan has the following risks:

- Subject to allowance certain administrative creditors could reject the Plan and the payments offered therein over time forcing liquidation as Debtor could not comply with a provision of the Code as required for Confirmation.

- Debtor's tenant could fail and the members of the Reorganized Debtor could reach a point where they are unable to fund the resulting shortfall.
- Debtor could be unable to refinance its Property within the time allowed in treatment of Class 2 or of Class 3.

## G. Executory Contracts and Expired Leases

The Plan, in Section 6.01, lists all executory contracts and unexpired leases that the Debtor shall assume under the Plan. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. Section 6.01 also lists the amounts the Debtor will have to pay to cure the arrears on such contracts or leases for any such defaults. Debtor believes it is not in default and that no cure amounts are required.

Debtor has included in its bankruptcy schedules a joint venture agreement, operating agreement and purchase and sale agreement with Salce on Debtor's Schedule of Executory Contracts as amended and filed in this case. All are rejected.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in Section 6.01 of the Plan will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the plan.

*The Deadline for Filing a Proof of Claim on a Claim Arising from the Rejection of a Lease or Contract shall be twenty-one (21) days after entry of the confirmation order on the docket of the Court.* Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise. No further notice of such deadline shall be provided.

## H. Tax Consequences of Plan

*Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.*

The Debtor has no opinion of tax counsel or accounting professional, and no rulings of any federal, state or local taxing authority has been or will be requested in connection with this plan.

Implementation of the contemplated Plan also may result in federal and state tax consequences to creditors and equity holders. The tax consequences may vary depending on the particular circumstances or facts regarding the claim and claimant or equity holder. Consequently, creditors and holders of equity securities are urged to consult with their own tax professionals in order to determine the tax implications of the Plan under applicable law.

16

## IV.   CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A.   Who May Vote on or Object to the Plan

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that all classes are impaired and that holders of allowed claims in each of these classes are therefore entitled to vote to accept or reject the Plan.

1.   *What is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the federal Rules of Bankruptcy Procedure.

**The deadline for filing a proof of claim in this case was August 8, 2011.**

2.   *What is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is impaired under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3.   *Who is **Not** Entitled to Vote*

The holders of the following six types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes
- holders of claims or equity interests in unimpaired classes;
- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and
- holders of claims or equity interests in classes that do not receive or retain any value under the Plan;
- administrative expenses.

**Even if you are not entitled to vote on the Plan, you may have a right to object to the confirmation of the Plan.**

### 4.   *Who Can Vote in More than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or whose claim is part priority and in part unsecured, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

### B.   **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed below.

### 1.   *Votes Necessary for a Class to accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class who return ballots voting on the Plan, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class who return ballots voting on the Plan, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class who vote, cast their votes to accept the Plan.

### 2.   *Treatment of Non-accepting Classes*

Even if one or more impaired classes reject the Plan, the court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

**You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.**

### C.   Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. In the case of Harborside, the analysis is very clear because the claims of the Town of Stratford, Dakota HRG, LLC, and Salce, all secured by the Property, exceed the value of the Property by a significant margin and the administrative and priority claims would also have to be paid before the other claims. Thus, without even considering such factors as the costs of liquidation clearly there would be no distribution beyond Salce.

### D.   Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

####   1.   *Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that it will have to pay on that date.

####   2.   *Ability to Make Future Plan Payments and Operate Without Further Reorganization*

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.

The Plan Proponent has provided projected financial information. Those projections are listed in Exhibit C. Although there is a monthly shortfall, Reorganized Debtor's equity is prepared to fund same as necessary. Moreover the continued successful operation of the restaurant and its payment of rent is obviously vital to long-term success of the Plan. As described above the Debtor's tenant has demonstrated its ability to succeed. Harborside further states in support of the feasibility of the Plan that the individual members of Hermanos and of The Covenant all have substantial past and current restaurant ownership and operational experience. Based on an aggregate of several dozens of years of successful restaurant operations said parties could take over the Debtor's restaurant operations if such a necessity arose.

Finally, although obviously speculative, Debtor believes the necessary refinancing or other funding needed to pay the Dakota claim as agreed will be located in not more than thirty (30) months.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

## V.   EFFECT OF CONFIRMATION OF PLAN

### A.   Discharge of Debtor

Discharge. On the Effective Date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor shall not be discharged of any debt (i)

imposed by the Plan, (ii) of a kind specified in §1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) if the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B). After the Effective Date of the Plan your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

**B.**     **Modification of Plan**

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, depending on the proposed changes, the Court may require a new disclosure statement and/or re-voting on the Plan. The Plan Proponent may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

**C.**     **Final Decree**

Once the estate has been fully administered, as provide in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion. While "fully administered" is not defined in the Code or Rules, the Plan states that the Reorganized Debtor may apply for a final decree upon "substantial consummation" as that term is defined in § 1101.

Dated this 25th day of July 2013.

Respectfully submitted,

HARBORSIDE ASSOCIATES, LLC

By: /s/ Luciano Coletta
Luciano Coletta
Duly authorized

COAN, LEWENDON, GULLIVER & MILTENBERGER, LLC
Counsel to Debtor

By: /s/ Carl T. Gulliver
Carl T. Gulliver, Esquire
495 Orange Street
New Haven, CT 06511
Telephone: (203) 624-4756
Facsimile: (203) 865-3673
cgulliver@coanlewendon.com

# EXHIBIT B

B25B (Official form 25B)(12/08)

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF CONNECTICUT

In Re:   **Harborside Associates, LLC**
          **Debtor**

**Case No.  11-50738 AHWS**

**Chapter 11**

---

*HARBORSIDE ASSOCIATES, LLC*
*FIFTH AMENDED PLAN OF REORGANIZATION*
*DATED OCTOBER 29, 2013*

### ARTICLE I
### SUMMARY

This Plan of Reorganization (the "Plan") under chapter 11 of the Bankruptcy Code (the "Code") proposes to pay creditors of Harborside Associates, LLC (the "Debtor") as set forth herein from its cash on hand and, over a period of time, from its cash flow from operations and from contributions from its equity owners.  A refinance of Debtor's Property will be necessary in not more than thirty (30) months.

This Plan provides for six classes of claims:  three classes of secured claims, one class for unsecured claims of $1,000 or less; one class for unsecured claims more than $1,000 each; one class of equity security holders.  Said classification depends upon application of §506 of the Code to fix a valuation for the Debtor's Property at an amount not in excess of the three secured classes.  Treatment of the classes is set forth in Article IV below.  This Plan also provides for the payment of Administrative Expenses and Priority Tax Claims within terms as allowed by the Code or in accordance with any agreement that may be reached with the respective claimant.

Rules of construction and definitions are set forth in Article VIII which incorporates the definitions and provisions of the Code.  Capitalized terms herein are specifically defined as set forth in Article VIII.

All creditors and equity security holders should refer to Articles II through IV of this Plan for information regarding the precise treatment of their claim.  A Disclosure Statement that provides more background and descriptive information regarding this Plan and the rights of creditors and equity security holders has been circulated with this Plan.  **Your rights may be affected.  You should read these papers carefully and discuss them with your attorney, if you have one.   If you do not have an attorney, you may wish to consult one.**

# ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS

2.01    Class 1.    Real Property Tax and Sewer Use Claims

The Allowed Secured Claims of the Town of Stratford and any assignees thereof, for real property tax and sewer use charges including costs, charges and fees Allowable in connection therewith to the extend Allowed first priority lien status pursuant to applicable state law, whether or not a lien has been recorded.

2.02    Class 2.    Secured Claim of Dakota HRG, LLC

The claim of Dakota HRG, LLC ("Dakota") or any assignee to the extent Allowed and secured by a first priority mortgage, assignment of rents and other security documents.

2.03    Class 3.    Secured Claim of The Salce Companies, LLC

All claims of The Salce Companies, LLC, whether evidenced by a mortgage on the Property or otherwise and specifically including without the intention of limiting the class, a claim secured by a mortgage in the sum of $500,000 recorded September 12, 2007, at volume 3103, page 87, among the Stratford land records, and a line of credit claim secured by a mortgage in the original maximum amount of $500,000 recorded on March 5, 2008, at Volume 3164, Page 120 (together, the "Salce Claims").

2.04    Class 4.    Small Unsecured Claims – Convenience Class

All unsecured claims Allowed under §502 of the Code that are in an amount less than or equal to, or by election of the claimant reduced to, $1,000.

2.05    Class 5.    General Unsecured Claims

All unsecured claims Allowed under §502 of the Code that are in an amount greater than $1,000 unless the claimant has opted to reduce its claim to $1,000. This class includes the claims, to the extent same are Allowed claims, of all claimants that hold a mortgage or other encumbrance on the Property but are not in classes 1, 2 or 3 above. Such ostensibly secured claims are included in this Class 5 on the basis that the secured positions of each such claimant will be determined by the Court to be of no value upon application of §506 of the Code.

2.06    Class 6.    Equity interests of the Debtor

All equity interests in the Debtor as set forth on the Debtor's books and records as of the Effective Date which consists of the 100% membership interest in the Debtor held by Continuity, LLC.

## ARTICLE III
### TREATMENT OF ADMINISTRATIVE EXPENSES,
### U.S. TRUSTEE FEES, AND PRIORITY TAX CLAIMS

3.01.    Unclassified Claims.    Under §1123(a)(2), Administrative Expenses and Priority Tax Claims are not in classes.

3.02.    Administrative Expenses.    Each holder of an Administrative Expense Allowed under § 503 of the Code, which include attorney fees subject to allowance will be paid in full in cash on the Effective Date as required by §1129(a)(9)(A) of the Code, or in accordance with agreements that may be reached between the Debtor and respective claimants.

3.03.    Priority Tax Claims.    Each holder of a Priority Tax Claim will be paid in full in equal monthly installments amortized with interest at the rate applicable under §511 on the outstanding balance over a period of eighteen (18) months commencing on the Effective Date.

3.04.    United States Trustee Fees.    All fees required to be paid pursuant to the provisions of U.S.C. §1930(a)(6) ("U.S. Trustee Fees") will accrue and be timely paid until the case is closed by entry of a final decree, dismissed, or converted to another chapter of the Code, unless otherwise ordered by the Court. Any U.S. Trustee Fees owed for quarters closing on or before the Effective Date of this Plan will be paid not later than the Effective Date. The Debtor shall also timely file with the Court monthly operating reports every month until such time as a final decree is entered by the Court or the Court enters an order converting or dismissing this case.

## ARTICLE IV
### TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

4.01    Claims and interests shall be treated as follows under this Plan:

| Class | Impairment | Treatment |
| --- | --- | --- |
| Class 1 – Real Property Tax and Sewer Use Claims | Impaired | Class 1 Real property tax and sewer use claims will be paid in full in sixty (60) monthly installments commencing on the fifteenth (15th) day of the first full calendar month after the Effective Date of this Plan, amortized with eighteen percent (18%) interest. The Class 1 claimants shall retain the liens securing their claims until paid in full. |
| Class 2 – Secured Claim of Dakota | Impaired | Class 2 Secured Claim of Dakota shall be paid $9,000 monthly commencing on the first day of the first full calendar month after the Effective Date of this Plan, amortized with interest on the outstanding |

| | | |
|---|---|---|
| | | balance at the note rate of four and one-eighth percent (4.125%). The creditor shall be paid its full outstanding balance on or before the last Business Day of the thirtieth full calendar month after the Effective Date. By agreement with the Plan Proponent, effective only in the event this Plan or an amendment thereto is confirmed, said claim, mortgage, and any other security therefore, shall be released by the creditor if either (a) the Reorganized Debtor pays the then full outstanding balance less $200,000 on or before the last Business Day of the twelfth full calendar month after the Effective Date, or, (b) if the Reorganized Debtor pays the then full outstanding balance less $100,000 after said date but on or before the last Business Day of the twenty-fourth (24th) full calendar month after the Effective Date. The creditor shall retain the lien securing its Class 2 claim until the balance is paid in full in accordance herewith. |
| Class 3 – Secured Claim of The Salce Companies, LLC | Impaired | All Salce Claims together shall be allowed in the total amount of $600,000 with interest from the Effective Date at 6% per year. Said claim shall be payable as follows:<br><br>• Paid $2,500 monthly commencing on the first day of the first full calendar month after the Effective Date of this Plan, until paid or settled in accordance with the following provisions.<br><br>• If not sooner paid, the Note matures and shall be paid in the total amount of $600,000 plus all outstanding, accrued and unpaid interest to the date of payment on or before the last Business Day of the thirty-sixth (36th) full calendar month after the Effective Date.<br><br>• By agreement with the Plan Proponent, effective only in the event this Plan or an amendment thereto is confirmed, said claim, mortgage, and any other security therefore, shall be released by the creditor |

if on or before   365 days after the Effective Date the Reorganized Debtor pays $500,000 plus all outstanding accrued and unpaid interest to the date of payment.

The Reorganized Debtor shall execute a note modification essentially in the form appended hereto as Exhibit D (the "Modified Note") setting forth the foregoing and following terms. All payments owed to Salce hereunder as set forth in the Modified Note must arrive in Salce's hands at 335 Ferry Boulevard, Stratford, CT 06615, or such other location as Salce may hereafter designate in writing, in order to be considered a timely payment, and the failure to have same delivered timely shall constitute an event of default, time being of the essence for all such payments. The Modified Note shall provide for acceleration upon breach in payments after a three-day written notice to the reorganized Debtor and counsel following a ten-day grace period. The three-day written notice shall be sent to the addresses for the reorganized Debtor and counsel as specified in the Plan for such notices and shall be transmitted by first class mail and by fax or email, whichever is designated for the Debtor and its counsel in the Plan.

In addition to nonpayment of the Modified Note, events of default shall include failure to timely pay pursuant to this Plan all Class 1 and Class 2 payments and to timely pay all post-confirmation municipal claims including without limitation water and sewer charges, and real property taxes, and all post-confirmation payments due Dakota or other holder of secured debt prior to Salce. It shall be a requirement of Confirmation that all such municipal claims accruing during the chapter 11 case through the date of Confirmation shall have been paid by the date of entry of the Confirmation Order. It shall also be an event of default should the reorganized Debtor fail to maintain proper and adequate insurance on the Property which shall name the holder of the Modified Note as mortgagee and shall provide proper proof of such coverage every year.

| | | |
|---|---|---|
| | | Salce shall agree to subordinate the Modified Note and mortgage securing same to new financing of the senior debt owed to Classes 1 and 2 in an amount not to exceed the allowed pre-petition claims of Class 1 and 2. The Debtor shall waive all defenses to the execution of and enforcement of the Modified Note and mortgage securing same and shall acknowledge and reaffirm the validity, execution and enforceability of the Modified Note and mortgage.<br><br>Salce shall release all pre-confirmation liens, mortgages or other encumbrances on the Property but for its senior most mortgage recorded among the Stratford Land Records September 12, 2007, at Volume 3103, Page 87, as modified by a Mortgage and Note Modification Agreement recorded March 5, 2008, at Volume 3164, Page 115, which shall serve to secure the Modified Note. Salce shall retain said lien securing its Modified Note, until the balance is paid in full or settled in accordance herewith. The Debtor and Salce shall trade mutual releases in a form acceptable to each other's counsel as to all other claims between them. Confirmation shall be contingent on Salce having withdrawn the Salce 1111(b) election. |
| Class 4 – Small Unsecured Claims | Impaired | Class 4 Small Unsecured Claims shall be paid one-third on the Effective Date, one-third 30 days after the Effective Date, and one-third 30 days thereafter of the Allowed amount. |
| Class 5 – General Unsecured Claims | Impaired | Class 5 General Unsecured Claims shall be paid their respective Pro Rata share of $500 monthly commencing on the fifteenth (15th) day of the first full calendar month after the Effective Date, for sixty (60) months. Any security therefore shall be released by the claimant. In addition any recovery, net of legal and professional fees and costs, of claims against SRRC-II and Anthony Villano and Post Road Management, LLC will be paid to Class 4 claimants until Class 4 is paid in full. |
| Class 6 – Equity Security Holders of the Debtor | Impaired | Class 6 Equity Security Holders of the Debtor, shall continue to hold 100 % of the equity membership in Harborside Associates, LLC. |

6

## ARTICLE V
## ALLOWANCE AND DISALLOWANCE OF CLAIMS

5.01    Disputed Claim.

a) A Disputed Claim is a claim that has not been Allowed or disallowed by a Final Order, and as to which a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection.

b) Any claims which Debtor has indicated in its Schedules as being disputed, contingent, or unliquidated and for which no proof of claim was filed are deemed disallowed.

5.02    Delay of Distribution on a Disputed Claim.  No distribution will be made on account of a Disputed Claim unless such claim is Allowed by a Final Order.

5.03    Settlement of Disputed Claims.  The Debtor will have the power and authority to settle and compromise a Disputed Claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure with service limited to appearing parties.

## ARTICLE VI
## PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.01    Assumed Executory Contracts and Unexpired Leases.

The Debtor assumes the following executory contracts and/or unexpired leases effective upon the Effective Date of this Plan.

| Counter-Party | Contract or Lease | Claimed Cure Amount |
|---|---|---|
| Riverview Bistro, LLC | Lease of Debtor's real property for restaurant operations | $0 |

The cure amounts, to the extent Allowed, shall be paid upon the Effective Date unless the subject of a pending objection, or shall be paid as may be otherwise agreed between the Debtor and respective counter-parties to the leases or contracts.

All other executory contracts and unexpired leases are rejected upon confirmation of this Plan.

## ARTICLE VII
## MEANS FOR IMPLEMENTATION OF THE PLAN

The Plan Administrator shall be Luciano Coletta. If at any time it becomes necessary in the opinion of the Reorganized Debtor's equity owners, a successor Plan Administrator shall be duly appointed by the Reorganized Debtor's equity.  The Reorganized Debtor, acting through the Plan Administrator, shall take all actions, as maybe reasonably required to implement the terms of this Plan.

7

Through or under the direction of Luciano Coletta, from proceeds of its operations or other resources as are available to it, the Reorganized Debtor shall disburse funds as provided herein to Allowed Tax Claims, Class 1 Claim, Dakota's secured claim, and Salce's secured claim, and such payments as and to the extent agreed with professionals holding Allowed Pre-Confirmation Administrative Expenses. In addition, the Reorganized Debtor acting through the Plan Administrator shall disburse the funds for the Class 4 convenience class and Class 5 general unsecured class as set forth and required in the Plan. Other than payments due insiders under the Plan, if any, the Reorganized Debtor shall have the absolute right of pre-payment of its financial obligations pursuant to this Plan, in whole or in part as to one claimant or one class, without penalty or alteration of obligations or rights as to other claimants or classes.

The company assumes and shall pay its normal operating costs and business expenses, whether pending at confirmation or arising thereafter, as and when due. The Debtor will pay its post-confirmation legal fees and costs when billed without the necessity of further Court authority.

Confirmation shall reserve and transfer to the reorganized Debtor to the extent still existing under applicable law all claims and rights under development approvals, and each contingent or unliquidated claim, as listed and described and as set forth in Debtor's Schedules A and B filed in this case, as amended, and as appended to the Disclosure Statement. Additionally confirmation reserves and transfers to the reorganized Debtor all rights and recoveries under Adversary Proceeding No. 13-05015 pending in the Court against defendants Shorty Long Iron I LLC, Anthony Villano and Ellen Villano. Confirmation also reserves and transfers to the reorganized Debtor all of Debtor's interest in a certain eminent domain action pending in the Connecticut Superior Court as Commissioner of Transportation/CT vs. Harborside Associates, LLC, et al., case no. FBT-CV09-5027821-S.

The Reorganized Debtor's equity holders will contribute the sum equivalent to any shortfall when and as required for performance of the Reorganized Debtor's obligations hereunder.

Luciano Coletta, Lorenzo Coletta, and Gabriele Villano have funded by capital contribution various requirements of Debtor including such expenses as retention of counsel and certain estate obligations for which they waive all claims herein, if any could be asserted, should this Plan or an amendment thereto is confirmed. Said individuals also have expended substantial time without compensation upon the affairs of the Debtor and also waive any claim, if any could be asserted, should this Plan or an amendment thereto be confirmed. Finally on-going consideration is provided as long as Reorganized Debtor's equity backstops Debtor obligations, and supplements monthly payments pursuant to the Plan as may be necessary.

But for Dakota, the Salce Class 3 treatment mortgage, and the Town, all parties to the Plan shall release encumbrances of any kind recorded against the Property. Said encumbrances include, without limitation, Continuity, Prime Bank, Anthony and Gabriele Villano, Luciano and Lorenzo Coletta, and Connecticut Business Credit. If such claims are not released the Reorganized Debtor may bring an action against any such party seeking an order directing such release. Salce shall also release all other pre-confirmation encumbrances. but for that certain mortgage securing the Class 3 treatment hereunder.

During the Chapter 11 case and at the time of this Plan, the manager or other person in control of the Debtor was Luciano Coletta. Mr. Coletta consulted with Lorenzo Coletta and Gabriele Villano, who

8

are two of the three other members of Hermanos, LLC, and with The Covenant, LLC. None of these parties, including Luciano Coletta, received, or shall receive any compensation from the Debtor during the period of plan performance.

If all of the applicable requirements of Bankruptcy Code §1129(a), other than §1129(a)(8) thereof, are met with respect to the Plan, the Debtor requests that the Bankruptcy Court, pursuant to §1129(b)(1), confirm the Plan notwithstanding the requirements of § 1129(a)(8) if the Plan does not discriminate unfairly and is fair and equitable with respect to each rejecting class.

The Debtor may file an application to the Court for entry of a final decree at anytime after substantial consummation.

## ARTICLE VIII
## DEFINITIONS AND RULES OF CONSTRUCTION

8.01.  <u>Definitions and Rules of Construction</u>. The definitions set forth in §§101, 363(a), 547(a), 1101, and 1125(a) of the Code shall apply when terms defined in the Code are used in this Plan. The Rules of Construction in §102 of the Code shall apply when construing this Plan. The Definitions set forth in the Code are supplemented as follows:

a) "Administrative Expense" means a right to payment Allowed under §503 of the Code, including §503(b)(9), and any reclamation claim Allowed under § 546(c).

b) "Allowed" means, with respect to a particular claim, (a) the dollar amount of a claim that is listed in the Debtor's Schedules, as they may from time to time be amended in accordance with Rule 1009 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), unless noted as disputed, contingent or unliquidated, if the claimant of such claim has not filed a proof of claim with the Bankruptcy Court within the applicable period of limitation fixed by the Bankruptcy Court pursuant to Rule 3003(c)(3) of the Bankruptcy Rules, or (b) if the claimant has filed a proof of claim with the Bankruptcy Court within the applicable period of limitation fixed by the Bankruptcy Court pursuant to Rule 3003(c) of the Bankruptcy Rules or if a proof of claim for such claimant is deemed filed under applicable law or by reason of an order of the Bankruptcy Court within such applicable period of limitation: (i) the dollar amount stated in such proof of claim, if no objection to such proof of claim has been interposed by a party in interest within the applicable period of limitations fixed by this Plan, the Bankruptcy Code or applicable Bankruptcy Rules, or as otherwise fixed by the Bankruptcy Court, or (ii) such dollar amount as shall be fixed by an order of the Bankruptcy Court which has become a Final Order, if an objection has been interposed by a party in interest within the applicable period of limitations fixed by this Plan, the Bankruptcy Code or applicable Bankruptcy Rules, or the Bankruptcy Court or, pending the determination of such objection, the dollar amount of such claim, if any, which would be Allowed in the relevant Class if such pending objection were to be granted in full by the Bankruptcy Court, or (c) with respect to the allowance of fees and expenses pursuant to §§ 330, 331, 503(b) of the Bankruptcy Code, such amount as shall be fixed by an order of the Bankruptcy Court which has become a Final Order. Unless otherwise specifically provided in this Plan or ordered by the Court, fees or charges and interest accrued from the Petition Date

through and including the Effective Date shall not be included in the Allowed Amount of any pre-Petition Date claim or interest.

c) "Bankruptcy Code" or the "Code" means the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §101 *et seq*., Title 11 of the United States Code.

d) "Bankruptcy Rules" or the "Rules" means the Federal Rules of Bankruptcy Procedure, as amended.

e) "Bankruptcy Court" or the "Court" means the United States Bankruptcy Court for the District of Connecticut, or such other court as may hereafter have jurisdiction of and act with respect to the Chapter 11 Case.

f) "Business Day" means any day except Saturday, Sunday and any other day on which the Office of the Clerk of the Bankruptcy Court is closed.

g) "Chapter 11 Case" means the entire pending proceeding commenced by the Debtor's petition for reorganization filed under Chapter 11 of the Bankruptcy Code and styled *In re Harborside Associate, LLC*, and bearing case number 11-50738 (AHWS).

h) "Confirmation Date" means the day on which the Bankruptcy Court enters the Confirmation Order on its docket.

i) "Confirmation Order" means the order entered by the Bankruptcy Court confirming this Plan in accordance with the provisions of the Bankruptcy Code.

j) "Debtor" or "Harborside" means Harborside Associates, LLC, a limited liability company formed under the laws of the State of Connecticut.

k) "Disclosure Statement" means the written document entitled "Harborside Associates, LLC, Third Amended Disclosure Statement dated July 25, 2013," relating to this Plan filed by the Debtor pursuant to §1125 of the Bankruptcy Code in connection with the Chapter 11 Case and approved by the Bankruptcy Court as containing "adequate information" (as the term is defined in §1125(a)(1) of the Bankruptcy Code), as the same may be amended or modified and approved by the Bankruptcy Court, including any exhibits and schedules annexed thereto and any documents delivered in connection therewith.

l) "Disputed Claim" shall have the meaning ascribed to in Article V hereof.

m) "Effective Date" means the first Business Day following the date that is fourteen days after the Confirmation Date. If, however, a stay of the Confirmation Order is in effect on that date, the Effective Date will be the first Business Day after the date on which the stay of the Confirmation Order expires or is otherwise terminated.

n) "Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction (i) which is not the subject of an appeal, or (ii) which shall not have been reversed,

stayed, modified or amended, or (iii) from which the time to appeal, seek review, certiorari or rehearing of such order shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules.

o)  "Impaired" has the meaning ascribed to it in §1124 of the Bankruptcy Code, and, without intending to limit or alter such meaning, generally can be described as meaning, as to a claim or interest,  the alteration of the legal, equitable or contractual rights to which a claim or interest would otherwise entitle the holder, or, as to a claim or interest on which payment has been accelerated due to default, failure to cure any contractual default and reinstate the maturity of such claim or interest existing prior to default and failure to compensate for any damages incurred as a result of the default.

p)  "Petition Date" means the date the Debtor filed the original petition commencing the Chapter 11 case, April 12, 2011.

q)  "Plan" means this plan of reorganization and any amendment hereto or modification hereof.

r)  "Plan Administrator" means Luciano Coletta.

s)  "Priority Claims" means any Allowed Claim, other than Administrative Expenses and Priority Tax Claims, to the extent entitled to priority in payment under §507(a) of the Bankruptcy Code.

t)  "Priority Tax Claims" means all claims against the Debtor entitled to priority under §507(a)(8) of the Bankruptcy Code, excluding penalties not for actual pecuniary loss, and only to the extent that such claims are not secured claims.

u)  "Pro Rata" means, with respect to an amount of cash to be paid or distributed on a particular date to a class of claims, a proportionate share of such cash in accordance with the ratio, as of such date, of the amount of each respective claim in the class to the aggregate of the amount of claims in the indicated class (including, in each such calculation, the full amount asserted by the respective creditors of any Disputed Claims in the class).

v)  "Property" means a parcel of improved real estate titled in the name of Harborside Associates, LLC, at 946 Ferry Boulevard, Stratford, Connecticut, consisting of about 3.3 acres overlooking the Housatonic River and improved by a free-standing 9,406 square foot restaurant building and parking area.

w)  "Schedules" means (i) the schedules of assets and liabilities, current income and expenditures, and executory contracts and unexpired leases and (ii) the statement of financial affairs, including any amendments thereto, which were filed by the Debtor with the Bankruptcy Court in accordance with Bankruptcy Rule 1007(b).

**ARTICLE IX**
**DISCHARGE**

9.01    Discharge.    On the confirmation of this Plan, the Debtor will be discharged from any debt that arose before the Confirmation Date, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:  (i) imposed by this Plan; (ii) as to an individual Debtor, of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Rules; or (iii) of a kind specified in § 1141(d)(6)(B).

## ARTICLE X
## GENERAL PROVISIONS

10.01. Post-Confirmation Operations.    Except as specifically limited by this Plan, the Reorganized Debtor shall have full and complete authority to manage its business and affairs in such manner as it deems to be prudent subject only to its bylaws and articles, as amended, its post-confirmation contractual liabilities, and applicable Federal and State laws.

10.02. Corporate Charter.    In accordance with §1123(b)(6) of the Code, the Debtor and Reorganized Debtor, during the pendency of plan performance shall issue no monetary equity securities and shall issue only one class of voting equity securities which shall be empowered to govern the affairs of the Reorganized Debtor pursuant to applicable law and the Confirmed Plan.

10.03. Professionals. In the period subsequent to confirmation of this Plan, but prior to closing of the Chapter 11 Case, the Debtor may continue to avail itself of the services of professional persons whose employment were approved at or prior to the Confirmation Date in completing administration of the Chapter 11 Case and in the consummation and performance of this Plan, subject to the provisions of this Plan.  The Reorganized Debtor may employ additional professional persons to render services in and in connection with its business operations without approval of the Bankruptcy Court. With respect to services rendered and expenses incurred by any professional person after the Confirmation Date, subject to the occurrence of the Effective Date, the professional person may render periodic billings therefore to the Reorganized Debtor, which shall promptly pay same as provided herein without the necessity of further Court authority.

10.04.    Captions.    The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of the Plan.

10.05.    Severability.    If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.  In the event of any inconsistencies between the Plan and Disclosure Statement, terms of the Plan shall prevail.

10.06.    Binding Effect.    The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

10.07.    Controlling Law.    Unless a rule of law or procedure is supplied by federal law (including the Code or the Rules), the laws of the State of Connecticut govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

10.08.  <u>Computing Time</u>.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

10.09.  <u>Business-Day Payments</u>. Except as otherwise specifically stated respecting payments to Class 3, if any payment or act under this Plan shall be required to be made or performed on a date which shall be a Saturday, Sunday or legal holiday, or on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

10.10.  <u>Returned Mail</u>.  The Reorganized Debtor, or any retained professional person shall have no obligation to locate the holder of a claim or interest whose distribution or notice is properly mailed, but nevertheless returned, it being the responsibility of holders of claims or interests to provide notice of address changes as set forth below.  Any distribution that shall be returned because of the inability to locate such holder shall be treated as an unclaimed distribution.  In the event that any distribution of property remains unclaimed for a period of 90 days (or if said 90th day shall not be a Business Day, then the next Business Day subsequent to said 90th day) subsequent to it having been originally mailed to the holder entitled thereto, such unclaimed distribution shall be deemed forfeited by such holder, whereupon all right, title and interest in and to such unclaimed distribution, including all interest thereon shall immediately and irrevocably revert to the Reorganized Debtor.

10.11.  <u>Notices</u>.  Any notice required to be provided under this Plan to the Debtor shall be made in writing and addressed to Harborside Associates, LLC, Attention: Luciano Coletta, 39 Elm Street, West Haven, CT 06516, and via facsimile to (203) 934-0470, and to Harborside Associates, LLC, c/o Attorney Carl T. Gulliver, Coan, Lewendon, Gulliver & Miltenberger, LLC, 495 Orange Street, New Haven, CT 06511 and via email to cgulliver@coanlewendon.com.

10.12.  <u>Payments</u>.  Unless the context clearly requires otherwise, whenever this Plan states that a payment hereunder shall be "made," "issued," "disbursed" or "received" on a particular date, the Plan Administrator shall place such payment in the form of the Debtor's or Reorganized Debtor's check in the United States mail, first class, postage prepaid.  The Plan Administrator shall not be required to issue any disbursement in a sum less than $5.00.

## ARTICLE XI
## RETENTION OF JURISDICTION

11.01  In addition to the continued jurisdiction of the Bankruptcy Court subsequent to the Confirmation Date which is provided for as a matter of law by the Bankruptcy Code and Bankruptcy Rules, the Bankruptcy Court shall retain jurisdiction as may be required under this Plan or the Code for the following purposes:

(1)     To fix allowances of compensation;

(2)     To determine the classification of any claim or interest, the determination of such objections as may be filed to claims or interests, and the re-examination of the allowance of any claim or

interest in accordance with and as limited by the Bankruptcy Code, the Bankruptcy Rules, or other applicable federal, state or local law;

(3)     To determine any and all proceedings to set aside liens or encumbrances, and to recover any preferences, transfers, assets or damages to which the Debtor may be entitled under applicable provisions of the Bankruptcy Code or other federal, state or local law;

(4)     To hear and determine (a) all applications for rejection or termination of executory contract(s) filed prior to the Confirmation Date, and (b) all claims arising from the rejection of any executory contracts, and to consummate the rejection and termination thereof;

(5)     To adjudicate all claims to a security or ownership interest in any property of the Debtor or Reorganized Debtor or in any rents, proceeds or profits thereof and to set aside and/or determine the extent and priority of liens or encumbrances;

(6)     To adjudicate all claims or controversies arising out of any purchases, sales or contracts made or undertaken by the Debtor during the pendency of the Chapter 11 Case, including those effected by the confirmation of this Plan;

(7)      To determine all questions and disputes regarding title to the Debtor's assets, and resolve all causes of action, controversies, and disputes or conflicts, whether or not subject to actions pending as of the Effective Date, between the Debtor and any other party, including, but not limited to, any right of the Debtor to recover assets pursuant to the provisions of the Bankruptcy Code;

(8)     To recover assets wherever located, or judgments by reason of preferences, transfers of  assets or damages to which the Debtor may be entitled under applicable law and to administer, including the appointment of a trustee if the Court deems it appropriate, any later discovered assets of this estate;

(9)     To correct any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order as may be necessary to implement the purposes and intent of this Plan;

(10)    To enforce and interpret the terms and conditions of this Plan and to determine all controversies and disputes arising under or in connection with this Plan;

(11)    To modify this Plan subsequent to the Confirmation Date, to the extent allowed under the Bankruptcy Code and Bankruptcy Rules;

(12)    To adjudicate and determine any cause of action provided for under this Plan or the Confirmation Order;

(13)    To determine such other matters as may be set forth in the Confirmation Order or for which relief may be granted under the Bankruptcy Code or Bankruptcy Rules;

(14)    To enter any order, including injunctions, necessary to enforce title, rights and power of the Debtor and to impose such limitations, restrictions, terms and conditions of such title, rights and powers as this Bankruptcy Court may deem appropriate;

(15)    To hear any matter brought on by proper application by a claimant or holder of an interest claiming that payments or distributions pursuant to this Plan have not been properly made, in terms of the amount, timing, or otherwise;

(16)    To make such other orders as are necessary or appropriate to implement the provisions of this Plan;

(17)    To enter a Final Order closing the Chapter 11 Case; and

(18)    To implement the provisions of this Plan in the manner provided under §§ 1142(a) and (b) of the Code.

Dated this 29th day of October 2013.

Respectfully submitted,

HARBORSIDE ASSOCIATES, LLC

By: /s/ Luciano Coletta___
Luciano Coletta, Member, Duly Authorized


COAN, LEWENDON, GULLIVER & MILTENBERGER, LLC
Counsel to Debtor

By: /s/ Carl T. Gulliver_____
Carl T. Gulliver, Esquire
495 Orange Street
New Haven, CT 06511
Telephone: (203) 624-4756
Facsimile: (203) 865-3673
cgulliver@coanlewendon.com